# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| SHELIA MURPHY | CIVIL ACTION NO. 20-614 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| UNIVERSITY HEALTH SHREVEPORT, LLC, ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

In this discrimination case, defendant University Health Shreveport, LLC ("UHS") alleges that it fired plaintiff Shelia Murphy ("Murphy"), a healthcare professional, because she never obtained her Louisiana registered nurse ("RN") license. Murphy, however, disputes this claim and instead argues that UHS's decision was discriminatory, in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act ("ADA").[1]

UHS now moves for summary judgment on all of Murphy's claims.[2]  For the following reasons, UHS's motion is **GRANTED**.

## I. Background

In 2017, UHS created a Vice President ("VP") position for perioperative services at its main campus in Shreveport, Louisiana.[3]  UHS wanted the individual in this new role to manage day-to-day clinical and business operations in the perioperative

---

[1] Record Document 20 (Amended Complaint).  Murphy also brought a claim of age discrimination under the Age Discrimination and Employment Act in her Complaint. However, Murphy does not wish to pursue this claim.  It is therefore **DISMISSED**.

[2] Record Document 34.

[3] Record Document 38-1, p. 2 ¶ 3.

department.[4]  To fill the position, UHS enlisted a recruiting company to advertise the opening and field prospective candidates.[5]  To that end, the recruiting company and UHS created an application brochure to promote the position to potential applicants.[6]

Early in the brochure drafting process, UHS provided the recruiting company a preliminary "Needs Assessment" that outlined UHS's preferences for a successful applicant.[7]  Among its other specifications, it noted that a RN license was not an "absolute" requirement for the VP position.[8]  But later in the process, while creating the required qualifications in the job description, Mark Randolph ("Randolph"), President of UHS, decided that the position would actually require an "experienced nurse."[9]  Essentially, Randolph wanted someone in the position to monitor "instrument processing" and provide clinical oversight in the perioperative department. [10] As a result, on the official job description used by UHS and the recruiting firm, a Louisiana RN license was listed as a "Minimum Qualification."[11]

At the time the recruiting company and UHS posted the VP job listing, Murphy worked in California as a nurse.[12]  Interested in the position in Shreveport, though, Murphy applied, and through the recruiting agency, secured a phone interview with

---

[4] *Id.* at pp. 2−4 ¶ 4.
[5] *Id.* at p. 3 ¶ 5.
[6] Record Document 34-3, pp. 93−99.
[7] Record Document 34-4, pp. 16−19.
[8] *Id.* at p. 19.
[9] *Id.* at pp. 7−8.
[10] *Id.*
[11] *Id.* at p. 28 & 34-3, p. 103.
[12] Record Document 38-1, p. 14 ¶ 30.

Randolph shortly afterward.[13]   This phone call led to an in-person meeting, and eventually the job offer in April 2018.[14]   But soon after UHS offered the position to Murphy, UHS's HR director raised red flags about Murphy's credentials.[15]

The HR director, in particular, was concerned about the status of Murphy's nursing licenses in two states where she worked as a nurse—Virginia and California.[16] With this in mind, the director reached out to the recruiting firm and asked about their vetting procedures for professional licenses.[17]   In response, the recruiting firm said Murphy characterized the Virginia license issue as a "minor" technical problem.[18] The issue was that Murphy failed to complete paperwork before leaving a Virginia medical center.[19]  When the medical center filed a complaint against Murphy, she took no steps to expunge her record.[20]  As a result, the nursing board suspended her multi-state Virginia license.[21]

The California license issue related to the same problem Murphy faced in Virginia.[22]   Because she had a reprimand on her multi-state license, upon her relocation to California, the nursing board mandated that Murphy undergo a probation period.[23]  The probation required Murphy to reside in state for six months

---

[13] *Id.* at p. 8 ¶ 14.
[14] *Id.* at pp. 8–9 ¶ 15.
[15] *Id.* at p. 10 ¶ 22.
[16] Record Document 34-6, p. 12.
[17] *Id.*
[18] *Id.*
[19] Record Document 38-1, pp. 13–14 ¶¶ 26–28.
[20] *Id.* at pp. 13–14 ¶ 28.
[21] *Id.* at p. 14 ¶ 28.
[22] *Id.* at pp. 14–15 ¶ 32.
[23] *Id.* at p. 15 ¶ 33.

before the board approved her California license.[24]   Murphy never completed this probation, though, because she relocated to Shreveport before the period ended.[25]

Nevertheless, at the time Murphy started at UHS, its administration was aware of these issues and the fact that Murphy did not have a RN license in Louisiana.[26]  UHS alleges that Murphy assured it that she would clear the licensing problems in other states and apply for a Louisiana license by endorsement.[27]  Pending her certification, UHS contends it amended Murphy's job description to allot her six months—and then nine—to get the license.[28]  Murphy, though, disputes UHS's claims. She instead asserts that a Louisiana RN license was never an absolute requirement for her position.[29]  To support her claim, she points to internal emails and documents that she believes cast doubt over UHS's allegations.  She also points to conversations she had with Randolph about her hospital responsibilities.[30]  In these conversations, Murphy alleges that Randolph assured her that UHS planned to change her position to "VP of Perioperative Operations," a role that did not require a RN license.[31]

Despite Murphy's beliefs and Randolph's alleged assurances, however, Murphy's role never changed.  UHS also emailed Murphy multiple times throughout

---

[24] *Id.*
[25] *Id.*
[26] Record Document 34-6, p. 12.
[27] Record Document 34-5, p. 8.  A license by endorsement is a way for out-of-state nurses to become licensed in Louisiana.  Record Document 34-3, pp. 146−47.
[28] Record Document 34-5, pp. 4, 10.
[29] Record Document 38-1, p. 15 ¶ 34.
[30] Record Document 38-5, p. 20.
[31] *Id.*

her tenure referencing the status of her Louisiana license.[32]  Murphy says she does not remember receiving or acknowledging these emails.[33]  Even so, Murphy traveled to Baton Rouge to apply for a Louisiana license at the nursing board.[34]  She claims she made this trip because she planned to seek employment elsewhere, yet Murphy billed the cost of her trip to UHS.[35]  Otherwise, during the first few months of her employment, UHS seemed satisfied with Murphy's performance.  Notably, UHS awarded Murphy an "outstanding" on her first annual review, and Randolph sent her praise-filled messages indicating he approved of her work.[36]

Unfortunately, however, in December 2018, Murphy received concerning news; her young son required serious surgery.[37]  To manage his care, Murphy needed time away from her professional responsibilities.[38]  Because she had yet to accrue enough time for medical leave, she offered to resign her VP position at UHS.[39]  But Randolph rejected her offer and instead allowed Murphy to take paid leave.[40]  During Murphy's absence in December, though, UHS received an anonymous email raising concerns about her nursing credentials.[41]  Escalating the situation further, Louisiana State

---

[32] *See, e.g.*, Record Document 34-3, pp. 145−46, 148.
[33] Record Document 38-1, pp. 17−18 ¶ 38.
[34] *Id.* at pp. 22−24 ¶¶ 46−49.
[35] *Id.* at pp. 25−26 ¶¶ 55−56.
[36] Record Document 38-6, pp. 1−8.
[37] Record Document 38-1, p. 26 ¶ 57.
[38] *Id.*
[39] *Id.*
[40] *Id.* at p. 26 ¶ 58.
[41] Record Document 34-5, p. 18.

University's hospital compliance office also called UHS regarding the status of Murphy's Louisiana RN license.[42]

A few weeks later, in January 2019, a letter signed by Murphy's operating room ("OR") staff surfaced in UHS's HR Department.[43]  The letter contained twenty-four signatures and expressed complaints about Murphy's staff management.[44]  The signees—more than half of whom were black—were all OR staff working under Murphy's supervision.[45]  Murphy claims the letter was ripe with racial animus and further alleges that she reported this fact to UHS.[46]  A few days after the letter, Murphy's son underwent another surgery and UHS allowed Murphy more time away.[47]

Meanwhile, during Murphy's second absence, Randolph claims he received a phone call from the Director of the Louisiana State Board of Nurses.[48]  He and a witness allege that the Director told him that Murphy would never receive a license in Louisiana.[49]  Considering this fact, the next month, in February, Randolph claims that he decided to terminate Murphy's employment.[50]  As a result, UHS informed Murphy that she was fired because she never obtained a Louisiana RN license.[51]

---

[42] *Id.* at pp. 12−13.
[43] Record Document 38-3, pp. 7−8.
[44] *Id.*
[45] *Id.* & 39-1, pp. 1−2.
[46] Record Document 38-5, p. 11.
[47] Record Document 38-1, p. 27 ¶ 59.
[48] Record Documents 34-4, p. 18 & 34-7, p. 8.
[49] *Id.*
[50] Record Document 34-4, pp. 21−22.
[51] *Id.* at p. 22.

Murphy claims, however, that UHS's decision was racially motivated and related to her disabled son. [52]  She further argues that UHS had a larger struggle with racial discrimination.[53]  Murphy alleges, for instance, that UHS kept her from important meetings, subjected her to secondhand racist slights, and assigned her a larger workload than other non-minorities in similar positions.[54]  UHS, on the other hand, refutes this and contends that Murphy cannot carry her burden to present a prima facie case of discrimination.[55]  And even if Murphy can make an adequate prima facie case, UHS argues that she has no evidence that its decision to fire her was discriminatory.[56]  For this reason, UHS claims it is entitled to judgment as a matter of law.[57]

## II. Law and Analysis

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*,

---

[52] Record Document 38-2, p. 1.
[53] *Id.* at pp. 7–8.
[54] *Id.*
[55] Record Document 34-2, at 15–16.
[56] *Id.* at pp.16–17.
[57] *Id.* at p. 25.

477 U.S. 317, 322 (1986).  When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence.  *See id.* at 322–23.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact, the nonmovant must demonstrate that there is, in fact, a genuine issue for trial by going "beyond the pleadings" and "designat[ing] specific facts" for support.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325)).  "This burden is not satisfied with some metaphysical doubt as to the material facts," by conclusory or unsubstantiated allegations, or by a mere "scintilla of evidence."  *Id.* (internal quotation marks and citations omitted).  However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).  While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so "weak or tenuous" that it could not support a judgment in the nonmovant's favor.  *Armstrong v. City of Dall.*, 997 F.2d 62, 67 (5th Cir. 1993).

Additionally, Local Rule 56.1 requires the movant to file a statement of material facts as to which it "contends there is no genuine issue to be tried."  The opposing party must then set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried."  W.D. La. R. 56.2.  All material facts set forth

in the movant's statement "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." *Id.*

## B.  Race Discrimination Claim

Under Title VII, an employer may not "discharge any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1).  When, as in this case, a plaintiff offers only circumstantial evidence of discrimination, the three-step *McDonnell Douglas* framework applies.  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Under this framework, a plaintiff must first assert a prima facie case of discrimination, which, if established, raises a presumption of discrimination.  *Methodist Hosp. Sys.*, 271 F.3d at 219.  Next, "[t]he employer must [] produce a legitimate nondiscriminatory reason for the adverse employment decision."  *Id.*  When the employer provides a legitimate reason, the presumption of discrimination dissipates.  The plaintiff must then prove that the employer's given reason for the termination was pretextual and that she was discriminated against because of her protected status.  *Id.* at 219–20.

The first step in this framework, therefore, requires Murphy to present a prima facie case of race discrimination.  To do so, she must show that she (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

Murphy, as an African American female, is a member of a protected class who was fired by UHS, and thus suffered an adverse employment action. UHS also replaced Murphy with a white woman.[58]  As a result, Murphy meets the first, third, and fourth requirements of a prima facie case, leaving only the second requirement—whether she was qualified for her position—in dispute.  UHS claims that Murphy was not qualified because she never registered as a nurse in Louisiana.[59]  Murphy, on the other hand, claims that she was not aware of the license requirement and does not recall conversations with UHS staff about obtaining a RN license.[60]  Rather, Murphy alleges that she had discussions with Randolph—her direct supervisor—who communicated that UHS eventually planned to remove clinical oversight from her duties.[61]  She also points to UHS's "Needs Assessment" sent to the employee recruiting firm, which indicated a Louisiana RN license "was not absolute."[62]  Murphy finally cites the "outstanding" performance review she received just a few months before UHS fired her.[63]  The review did not include anything about obtaining a license.  These facts coupled with UHS's decision to interview and hire her, she argues, suggest that she is at least minimally qualified for her position.[64]

The Court will not automatically assume that Murphy was qualified because UHS hired her.  *See Lewis v. Jefferson Par. Hosp. Serv. Dist. No. 2*, 956 F. Supp. 2d

---

[58] Record Document 38-4, at 9.

[59] Record Document 34-4, p. 22.

[60] Record Document 38-1, pp. 17–18 ¶ 38.

[61] *Id.*

[62] Record Document 34-4, p. 19.

[63] Record Document 38-3, p. 19.

[64] Record Document 38-2, p. 6.

722, 734 (E.D. La. 2013), *aff'd,* 562 F. App'x 209 (5th Cir. 2014) (citing *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988)) (holding that a plaintiff was unqualified even after she was hired because she did not possess the necessary credentials for the possession).  The evidence shows that UHS expected Murphy would obtain a license during her first few months of employment.[65]  And while there may be a fact dispute about whether Randolph downplayed the urgency of securing a Louisiana license, there is no dispute that a Louisiana RN license was a minimum qualification on the official job description for Murphy's position.[66]  Unlike the job description, the "Needs Assessment" Murphy cites was not the final document that governed the required qualifications for her position.[67]  Murphy provides no evidence that proves otherwise.

Without a Louisiana RN license, Murphy could not legally engage in clinical oversight, although this was always a component of her job duties.  The evidence provided by UHS shows that it anticipated Murphy to perform this oversight once she obtained her license.[68]  UHS claims it allowed Murphy a six, then nine-month period to obtain a license, which Murphy was unable to do.  While Murphy disputes such a period existed, UHS's evidence includes multiple emails to Murphy that stressed the need for her to apply for a Louisiana license.  One email from the Chief Nursing Officer

---

[65] Record Document 34-5, p. 4.  For example, the HR Director testified the job description was amended to allow Murphy time to obtain a license within the first six months of hire.  *Id.*  Once the six months passed, UHS allowed an additional three months.  Record Documents 34-10, p. 2–3 & 34-4, p. 9.
[66] Record Document 34-3, p. 103.
[67] Record Document 34-4, p. 7.
[68] *Id.* at p. 9 & 34-6, pp. 6–7.

stated, for instance, "I really need you to get licensed for this state ASAP."[69]  Another from an HR director said, "we need to decide on [the] expected date of completion for you to receive your Louisiana RN license."[70]  These emails were sent within the first few months of Murphy's employment.  More than six months into her tenure, she even booked a one-day trip to Baton Rouge to register as a nurse at the nursing board.[71]  Even though the board never approved her application, she nevertheless billed the costs of this trip directly to UHS.[72]  Ultimately, the evidence demonstrates that one of the requirements for Murphy's position was a Louisiana nursing license.  Without this license, Murphy cannot point to any evidence that she was qualified for her role.

Drawing on the analysis applied in *Bienkowski v. American Airlines*, the Fifth Circuit considers professional licenses "necessary qualifications" when required by an employer; they may, therefore, be used to analyze whether an employee can establish a prima facie case of discrimination.  *See Bienkowski*, 851 F.2d at 1506 n. 3 (explaining that the "loss of a necessary professional license" may render an employee "unfit for the position for which [s]he was hired").  Here, at the time of her firing, Murphy had a suspended multi-state license in Virginia and a revoked California license she lost during her tenure at UHS.[73]  The undisputed facts also show that Murphy never obtained a Louisiana RN license.  As a result, she did not meet the objective qualifications outlined in the official job posting.

---

[69] Record Document 34-3, pp. 145−46.
[70] *Id.* at p. 148.
[71] *Id.* at pp.112−115.
[72] *Id.* at p. 88.
[73] Record Document 38-1, p. 30 ¶ 65.

Regarding the praise Murphy received during her tenure, the Court finds that it is not relevant in this specific analysis.  Praise, like experience, is no substitute for the minimum licensing requirement.  *See, e.g.*, *Lewis*, 956 F. Supp. 2d at 735 (determining that experience could not "compensate for a plaintiff's failure to hold the 'minimum educational requirement'") (quoting *Merwine v. Bd. of Trustees for State Institutions of Higher Learning*, 754 F.2d 631, 637 (5th Cir. 1985)).  The issue here is not whether Murphy was successful in her role, but whether she met the objective qualifications for the position.  *See Lewis*, 562 F. App'x at 211.  In other words, even if Murphy has the training, experience, and capacity to excel as a nurse, she cannot engage in the clinical duties only registered nurses may carry out under Louisiana law.[74]

In short, Murphy has not submitted evidence to "contradict or diminish in any way the simple, uncontested and stipulated fact" that she "did not possess the published minimum [qualification] requirement" for the position of VP of Perioperative Services. *Merwine*, 754 F.2d at 637.  For this reason, she cannot present a prima facie case of discrimination.  *See Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681 (5th Cir. 2001) ("[E]mployee must demonstrate that [s]he meets objective hiring criteria at the prima facie case stage[.]").  But even assuming she could, Murphy's discrimination claim is foreclosed because she cannot satisfy her burden on the final step of her Title VII action, which the Court will address below.

---

[74] *Id.* at p. 102 & 34-4, pp. 7–8. For state laws regarding nursing practices in Louisiana, see generally La. Stat. §§ 37:913 to :1020.

13

If Murphy had established a prima facie case of discrimination, the Court would next proceed with the second step in the *McDonnell Douglas* framework.  At this stage, UHS needs to offer a legitimate, nondiscriminatory reason for Murphy's termination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 142 (2000).  To do so, it "must provide both 'clear and reasonably specific reasons' for its actions.*" Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001) (quoting *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)).  This is a burden of production, not persuasion, and "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  As discussed above, UHS claims that it fired Murphy because she did not have a Louisiana RN license.  This reason, if "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.*  UHS has therefore satisfied its burden.

Because UHS has produced a legitimate, non-discriminatory reason for its decision, the third step in the *McDonnell Douglas* analysis requires Murphy to show that UHS's stated reason for her discharge is false or unworthy of credence. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (citing *Laxton v. Gap Inc.,* 333 F.3d 572, 538 (5th Cir. 2003)).  She must also substantiate her claim of race discrimination through evidence capable of proving that discriminatory animus lay at the heart of UHS's decision to fire her. *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).  Murphy therefore cannot prove that UHS's decision is "'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that

14

discrimination was the real reason" for UHS's decision. *St. Mary's*, 509 U.S. at 515 (emphasis in original).

Arguing that UHS's proffered reason for her firing is untrue, Murphy alleges she did not need a license for her role. To support her argument, she cites alleged conversations with Randolph who she says downplayed the necessity of a RN license.[75] Pointing to these conversations and some internal UHS emails, she claims that UHS planned to develop her position into a role where a license was unneeded; it wanted to remove all clinical oversight and have Murphy work as a "service line executive" without a RN license.[76]

While the evidence shows UHS considered making this change,[77] the change was never realized. Instead, when UHS fired Murphy, she occupied the same role UHS hired her for; a role that required a Louisiana RN license per the job posting. Here, it is not the Court's role to second-guess UHS's business decision not to alter Murphy's role at the hospital. Though Murphy may disagree with UHS's decision, "[m]anagement does not have to make proper decisions, only non-discriminatory ones." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). Even if UHS did not sufficiently stress the need for Murphy to obtain a RN license during her tenure, or bungled communications with Murphy altogether, absent evidence of discrimination, these facts alone do not show pretext. *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991). ("The existence of competing evidence about the

---

[75] Record Document 38-1, pp. 17–18 ¶ 38.
[76] Record Document 38-3, p. 20.
[77] *Id.*

15

objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."). Here, Murphy cannot refute the evidence that shows that UHS had an internal pattern of concern regarding her credentials throughout her nine-month career at UHS.

Murphy nevertheless contends that UHS is masking its unlawful action behind a deceptive pretense.  She claims that UHS instead fired her in response to racially motivated staff complaints.[78]  Murphy, for instance, points to a letter the OR staff submitted to UHS.[79]  In the letter, the staff voiced their complaints about Murphy's OR schedule management.[80]  Among other grievances, the staff cited their extensive work hours and their lack of breaks.  They mentioned nothing related to Murphy's race.[81]  Even so, once UHS informed Murphy of this letter, she claims that she requested an investigation.[82]  Murphy believes she generated the staffs' discontent after she suspended a white nurse.[83]  As a result, for Murphy, the letter was infused with racial undertones.[84]  A few weeks after UHS informed Murphy about the letter, she was fired.[85]  For this reason, Murphy argues that UHS, influenced by the staffs' alleged racially motivated letter and Murphy's ensuing reaction, fired her.

---

[78] Record Document 38-2, p. 10.
[79] Record Document 38-3, pp. 7−8.
[80] *Id.*
[81] *See id.*
[82] Record Document 38-5, p. 113.
[83] *Id.* at p. 241.
[84] *Id.*
[85] Record Document 38-1, p. 36 ¶ 76.

Unhelpful to Murphy's theory, however, is the fact that more than half of the twenty-four employees who signed the letter were black.[86]  Notably, the individual who submitted the letter to UHS was a black woman.[87]  Murphy cannot point the Court to any evidence that shows the letter is racially fueled, and her speculation alone is insufficient to carry her burden. It is also undisputed that multiple employees from the UHS organization emailed Murphy on different occasions, stressing the need for her to register with the Louisiana nursing board.[88]  These emails were sent, in some cases, months before the OR letter ever surfaced.[89]  UHS also received warnings and notices before the OR letter that raised alarms about Murphy's ability to remain in her position without a RN license.[90]  Importantly, days before her discharge, Randolph and another witness also claim that UHS received a call from the nursing board itself, which indicated that Murphy would never be licensed in Louisiana.[91] Murphy does not provide any evidence that disputes these facts.

Also unhelpful to Murphy's theory is the fact that Randolph was the final decision maker when it came to Murphy's employment.  Because Randolph both hired and fired Murphy in a short time frame, the "same-actor inference" applies and creates a strong inference that discrimination was not the determining factor in Murphy's firing.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 229 n.16 (5th Cir. 2000).

---

[86] Record Document 39-1, pp. 1−2.
[87] *Id.*
[88] *See, e.g.*, Record Document 34-3, pp. 145−46, 148.
[89] *Id.*
[90] *Id.*
[91] Record Documents 34-4, p. 18 & 34-7, p. 8.

This inference is based on the idea that an employer is unlikely to hire someone from a group he dislikes, and then turn around and fire her a short time later.  *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996), abrogated on other grounds by *Reeves*, 530 U.S. at 133 (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)).  To be sure, Murphy does not claim that Randolph directed any discriminatory animus towards her.[92]  She only points to an alleged incident where Randolph relayed that he was questioned by staff as to why he would hire a black individual for the position.  In response, Randolph said he hired Murphy because she was the "best person" for the job.[93]  In fact, the evidence shows that Randolph praised Murphy throughout her tenure at UHS.[94]

Claiming broader racial discrimination at UHS, Murphy also argues that UHS excluded her from meetings and required her to carry a larger workload than other Vice Presidents at the hospital.[95]  She also points to racially charged text messages sent to other staff by outside vendors who did business with UHS.[96]  Murphy claims these texts crudely referenced her race, though she does not provide copies of the texts or describe the texts in detail.[97]  Nevertheless, Murphy does not argue that the individuals who sent the messages had any role in Randolph's decision to fire her.  See *Vasquez-Duran v. Driscoll Children's Hosp.*, No. 20-40837, 2021 WL 3775350, at *5

---

[92] Record Document 34-3, at pp. 41−42.
[93] *Id.* at p. 27.
[94] Record Documents 38-6, p. 8 & 38-4, p. 7.
[95] Record Document 38-2, pp. 7−8.
[96] *Id.* at p. 7.
[97] *Id.*

(5th Cir. Aug. 25, 2021) (reasoning that comments are not evidence of discrimination when not attributed to individuals with decision making authority).  Additionally, Murphy does not identify a specific comparator who she alleges UHS treated better than her, nor does she offer firsthand knowledge of other VP roles or provide any evidence that would tend to support her claims.

 To defeat summary judgment at this pretext stage, Murphy must provide something more than speculation and conclusory statements. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007).  Instead, there must be a legally sufficient reason to infer racial discrimination, and it is that link which is absent in this case.  In sum, Murphy cannot carry her burden of showing that UHS's reason for her firing was discriminatory in nature.  For these reasons, the Court must dismiss her Title VII racial discrimination claim.

C. Associational Disability Claim

Murphy also brings an associational disability claim under the ADA, arguing that UHS was at least in part motivated to fire her because of her son's disability. Under the ADA, it is unlawful to exclude or otherwise deny "equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).  Though the Fifth Circuit does not explicitly recognize associational disability claims, it does acknowledge that other courts in this Circuit recognize this cause of action. *Grimes v. Wal-Mart Stores, Tex., L.L.C.*, 505 F. App'x 376, 380 n.1 (5th Cir. 2013).  It noted that if such a claim were to exist, a plaintiff would need to

show that (1) she is qualified for the job; (2) suffered an adverse employment action; (3) the employer had knowledge of the employee's disabled relative; and (4) that the adverse employment action occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor in the employer's adverse action. *Id.* at 379.   After a plaintiff establishes a prima facie case, the *McDonnell Douglas* burden-shifting framework then applies.  *See id.*

It is undisputed that Murphy meets the second and third elements of a prima facie case; she was fired, and Randolph was aware her son was disabled.  Nevertheless, even if the Court were to assume she was qualified for her position, and thus meets the first element, Murphy's ADA claim is foreclosed because she cannot establish the fourth element of a prima facie case.  Murphy, in particular, is unable to present evidence that raises a reasonable inference that her son's disability was a determining factor in Randolph's decision to fire her.

In December 2018, Murphy discovered that her son would need significant medical care.  In response, she offered to resign her position at UHS because she was not yet eligible for time away under the Family Medical Leave Act ("FMLA"). Rejecting her offer, Randolph instead allowed Murphy to take time off so that she could care for her son.  Murphy's hiatus extended through the month of December until January, when, upon her discovery that her son required additional surgeries, Murphy asked for more time away.  Randolph again granted her request.  The next month, in February, UHS placed Murphy on administrative leave; she was fired soon

after.  As a result, roughly two months passed between the time Randolph discovered Murphy had a disabled son and the time when UHS terminated her employment.

Murphy does not allege that Randolph—the decision maker—made any negative comments about her disabled son before or during this period.  Nor does she allege that he ever denied her requests for leave so that she could tend to her son's medical needs.  In fact, in the face of Murphy's proposed resignation, Randolph rejected her offer and allowed Murphy to take paid leave even when Murphy was not eligible for time away under the FMLA.  Considering these circumstances, Murphy cannot establish a prima facie claim for associational disability.  *See Spinks v. Trugreen Landcare, L.L.C.*, 322 F. Supp. 2d 784, 796 (S.D. Tex. 2004) (holding that a plaintiff failed to establish a prima facie associational disability claim when the employer granted the requested time off and made no comments regarding the disabled family member).  Even if she did, her associational disability theory would fail at the pretext stage because UHS provided a legitimate nondiscriminatory reason for its decision, which Murphy is unable to rebut.  For these reasons, Murphy's associational disability claim is likewise dismissed.

## III. Conclusion

The Court finds that summary judgment is appropriate for both Murphy's race discrimination and associational disability claims.  Therefore, UHS's motion for summary judgment is **GRANTED**, and all of Murphy's claims against UHS are **DISMISSED WITH PREJUDICE**.

A judgment consistent with the Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** this 27th day of January, 2022.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE